IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MIKE VICKERS     PLAINTIFF

VS.     NO. _____

CRACKER BARREL OLD COUNTRY STORE, INC.,
NICK FLANAGIN, SANDY COCHRANE, DOUG
BARBER, CHARLIE AUSTIN, and JAY JANSEN     DEFENDANTS

## COMPLAINT

COMES NOW the Plaintiff, by and through counsel, Sutter & Gillham, PLLC, who for his Complaint, states:

### PARTIES AND JURISDICTION

1. Mike Vickers was employed by Defendant Cracker Barrel Old County Stores, Inc., (CBOCS) for nearly 20 years. His last position was that of a District Manager, which he held for 16 years. Vickers is a resident and citizen of the State of Arkansas.

2. CBOCS is a Tennessee, for-profit corporation, operating in an industry that substantially impacts interstate commerce, and is headquartered in Nashville, Tennessee. The individual defendants are persons, officers and managers of CBOCS who took part in the decisions and actions causing injury, which were direct out of the corporate office in Nashville, Tennessee. Many of them are residents and citizens of Tennessee, residing in the Middle District of Tennessee. This is an action brought for violations of 42 U.S.C. 1981, for an amount exceeding that required for diversity jurisdiction.

## GENERAL ALLEGATIONS OF FACT

3. In each year from 2010 through 2013, Defendant Cracker Barrel employed more than 500 persons during more than 20 weeks of the calendar year.

4. At all times, Vickers was a satisfactory employee.

5. In the past, Cracker Barrel has had to reach a settlement with US DOJ regarding racially discriminatory practices.

6. As a result, management, including Vickers, had training on issues of discrimination while with Cracker Barrel.

7. In 2010, Mike Vickers' boss was Al Dozier (Regional Vice President).

8. Nicholas Flanagin was Vice President of Restaurant Operations at CBRL Group, Inc., from July 2008 to November 3, 2010. After that he came Senior VP of Operations at Cracker Barrel Old Country Store, Inc., and his responsibilities included restaurant for all Cracker Barrel locations, supervising the 10 Regional Vice Presidents, and the Restaurant Operations Administration Team.

9. In 2009 and 2010, management was receiving direction to hire younger managers.

10. For instance in December 2009, Plaintiff sat down at Table 215, at 8:30 p.m., with Nick Flanagin, who started telling him that they needed to get younger District Managers, and that their Field Managers were too old.

11. Plaintiff said a manager named Scott was doing a good job. Flanagin asked how old he was. Plaintiff said he was in his early thirties. Flanagin then said they needed younger people.

12. For instance, in February 2010, Dozier called Vickers and told him we're looking for younger people.

13. In March 2010, Dozier told Vickers we're going to get Arkansas younger.
14. Dozier stated the Flanagin was putting pressure on him to hire younger managers.
15. Vickers also was told by a recruiter for his region, Patty Kearns, that they were being told to recruit younger people and it was going to get Cracker Barrel in trouble.
16. Rob Harig was Director of HR.
17. Rob Harig told the recruiters to recruit younger people according to Kearns.
18. In February 2010, at the Little Rock Airport, Vickers went to Cary Jones, who was in loss prevention and told him that they were trying to make Vickers hire younger people and that it was driving him crazy because it was wrong and against the law. Vickers stated that they had already gotten in trouble for this sort of thing. Vickers told Jones what Kearns had said.
19. The next day, Vickers was in a meeting in Texas, with 7 to 8 other District Managers, Jones, Dozier, Bob Doyle (Vice President of Quality Assurance), and Joe Hardman (Director of Loss Prevention and Jones' boss).
20. Dozier and Hardman were next to each other, and Vickers was seated directly across from Hardman.
21. Dozier made the comment that there were too many men in the room (all were male), and that they needed to get some women.
22. Hardman shook his head and stared at Vickers.
23. Days later, in March of 2010 Vickers was in Myrtle Beach, South Carolina, at a roll out of the "seat to eat" concept, which he had been instrumental in developing.
24. Anita Tabb, who was Project Manager for S2E, was there as well.

25. Anita told Vickers, that her boss, Mike Chissler, who was Director of Innovations, had told her to make detailed notes about Vickers and his activities and send them to Chissler on a weekly basis. Anita told Vickers it was wrong and they were coming after him.
26. Before this meeting, Vickers had the numerous honors and accomplishments.
27. After that meeting, Vickers was not awarded any more such honors and was no longer invited to COO classes.
28. COO classes are important for getting promotions.
29. Before that meeting, Vickers got calls from other members of management.
30. After that meeting, Vickers no longer got such calls.
31. Yet Vickers continued to run his stores in an effective, quality manner, and maintained good numbers.
32. In 2010, Vickers was warned after that meeting that they would wait for more than a year, and then start to take steps against him in retaliation.
33. Later in 2010, Kearns, who Vickers had specifically mentioned to Jones at the Airport, was fired, even though she had good evaluations.
34. Christy Dunblazer replaced Kearns and later told Vickers that the practice of recruiting younger workers as opposed to older workers was continuing.
35. In 2010, Cracker Barrel contracted with a company called Steritec to come and do inspections of their stores to help maintain their health and sanitary practices at an appropriate level.
36. The relationship was supposed to be a partnership, and they were supposed to keep the same inspectors.

37. Yet Vickers inspectors were regularly changed.

38. In 2011, Charlie Austin became Vickers' boss and RVP.

39. As soon as he came in, Austin started repeatedly directing Vickers to hire younger managers.

40. Indeed, Austin sent Vickers three managers who were in their twenties, who were very poor managers.

41. Meanwhile, Austin was trying to get Vickers to get rid of other, good managers.

42. Vickers did not follow the instructions to hire based on age as considering age in employment decisions is forbidden under the ADEA.

43. In May 2012, Austin wrote Vickers up for a score of 64 on the Steritec inspection at the 468 store in North Little Rock.

44. However, that score was incorrect and was later corrected to a 73, which was passing.

45. Other managers have had far more failed inspections without consequence.

46. For instance, DM Ray Johnson was promoted to Regional Vice President, despite 5 failed inspections in a row.

47. DM Bill Ballard failed actual health department inspections, which is more serious as it can cost money, cause further inspections, and become public knowledge, negatively impacting the brand. Vickers asked Ballard if he had been written up for this, and Ballard told him that Austin did not write him up, but just told him to do better.

48. John Beasley was a DM, who got transferred to a District with higher volume, and therefore more pay, even though he had gotten an inspection score of 59. Beasley was not written up.
49. DM Mike Prentiss was put into COO classes even though he got an inspection score of 62.
50. Austin managed in a way that was both discriminatory and retaliatory.
51. Austin fired one of Vickers best managers, who had been GM of the year four years ina row, for fraternization. The manager was in his forties. However, a manager in his twenties committed fraternization and was not fired.
52. Vickers had continued to get good evaluations because his numbers were good.
53. Vickers told Austin that the score was wrong, and that other people had failed more inspections, but Austin told him it did not matter, and that he was writing Vickers up anyway.
54. In late 2012, one of Vicker's GMs, Roy Espe, in Northwest Arkansas stated at a GM meeting that the way to keep staff in the dish-room was to hire Hispanics, preferably females.
55. Vickers immediately told Espe he could not do that.
56. Then, in February 2013, Vickers got a complaint of discrimination from Associate Manager, Mike Wiggins, aged approximately in his mid-fifties, that Espe was treating him in a discriminatory fashion.
57. The other associate managers at Espe's store were younger than Wiggins.
58. Accordingly, Vickers went and met with Wiggins as soon as he could

59. Wiggins told Vickers that he would be written up if he was not on the floor when Espe came in, but that nothing was done to the other managers, Ronnie Jones, Ben Campbell, and Rick Schadel. Wiggins indicated that Espe treated him in abusive manner, calling him up and cursing at him over a to go meal, even though there had been nothing wrong with it.
60. Wiggins told Vickers that Espe had engaged in discrimination based on race, color, gender, and ethnicity in that he would not let them hire anything but hispanic females in the dishroom.
61. Jones, as well as Elana Griffin, told Vickers that Jones had hired two white males in the dishroom and that Espe ran them off.
62. Notably, Griffin, who was very well qualified, was interviewing for a retail DM position, at the time. After writing the statement confirming discrimination, she did not receive the position.
63. All managers, except for Rick, confirmed Espe's behavior and gave statements.
64. Vickers called Jackie Wythie (ER Specialist) and asked that she get him the demographics of the kitchen and dishroom. This confirmed the pattern of discrimination in hiring based on color, race, ethnicity, and gender.
65. Vickers interviewed Espe who admitted to multiple discriminatory practices of discriminating based on color, race, gender, and ethnicity, by favoring Hispanic females for hiring in the dishroom, and refusing to hire Hispanic persons as wait staff.
66. Espe accused Ronnie Jones of doing this to get his job.

67. Although Espe was generally a competent manager, he had admitted to a pattern of illegal, discriminatory employment practices, and had recently been instructed not to do that. Espe was aware of the policies against discrimination.

68. Thus, Vickers recommended that Espe be fired to Austin and the home office.

69. Vickers' investigation and recommendation took two days.

70. Thus, Vicker's participated in an investigation of discriminatory practices that were illegal under Title VII, the ADEA, and 42 U.S.C. 1981, and by doing so opposed that conduct and engaged in an effort to vindicate the rights of minorities.

71. From there, Austin and the home office took four months to do any further investigation and make a decision. They decided to put a piece of paper in Espe's file, but nothing else.

72. In March of 2013, there was a meeting of District Managers, and other staff, from across the nation, at which Nick Flanagin appeared and spoke.

73. Flanagin stated at this meeting that the average age in the industry is 26. He then stated, we are 43. The tone, expression, and body language indicated this was not a good thing.

74. In mid-March of 2013, Austin came and gave Vickers an evaluation. This was about one month after Vicker's investigation of Espe.

75. Overall, the evaluation was good.

76. There were some portions of the evaluation where Vickers was given a needs improvement.

77. These ratings were subjective, not objective, as they were not based on any particular statistics.

78. As far as Vicker's statistics went, his numbers were good, and were far from the worst of the District Managers under Austin, or in the company.
79. At this time, Vickers was also put on a performance improvement plan by Austin.
80. The PIP accused Vickers of things that were not true, that were controverted by his evaluation. Vickers told Austin this.
81. Vickers was told by Austin that if he failed to meet the goals of the PIP in any area at all, he would be fired. Vickers was told that if he failed any Steritec or Health Department inspection he would be fired.
82. The PIP stated that Vickers complaints were over 1.0 and had to get lower. In fact, Vickers' complaints were at .9, and he told Austin this.
83. The PIP indicated that Vickers' management turnover was too high, and that he had been surprised by resignations. In fact, there was another DM with higher turnover. In addition, there was only one manager resignation that had come as a surprise.
84. Furthermore, there were District Managers who had worse numbers, including complaints, who had not been disciplined or put on a PIP.
85. Accordingly, Vickers indicated that he was being treated illegally.
86. Vickers filed an EEOC charge, alleging discrimination and retaliation.
87. Vickers made a complaint to the home office of retaliation and discrimination to Tonja Jones, employee relations managers. She said they would look into it.
88. Tonja Jones got back with Vickers and told him that they were fine with what Austin was doing, and that he should just work through the PIP.
89. Austin told Vickers that if he came back in a couple of weeks and fired him, that Vickers would thank him.

90. In May 2013, Mike Mott came and met with Vickers at Panera Bread. Jay Jansen, the Regional HR Manager was also present. Mott is the VP of Human Resources and reports to Doug Barber, who is Chief People Officer, and reports to Sandy Cochrane, who is CEO and President of the Board.
91. Mott told Vickers that he understood that Vickers and Charlie Austin were not getting along, and he was there to see what they could do going forward.
92. However, Mott never attempted to discuss, a transfer, Vickers' side of it, the allegations of discrimination and retaliation, how Vickers was doing on the PIP, hat might be done to alleviate the problems between Vickers and Austin, or Vickers performance.
93. Instead, Mott offered Vickers a severance package, even though Vickers had not yet completed the PIP, and his numbers had been improving.
94. During this meeting, Mott told Vickers that even if he did not accept the severance package, this is where it would end eventually.
95. Shortly after that meeting, Vickers was suspended. Paul Seals, a VP of Human Resources, told Vickers he was being suspended, and said that it was Austin's decision.
96. Vickers was told that it was based on an investigation going on into a accounts receivable issue in North Little Rock.
97. Despite the fact that an investigation was going on, Vickers was never asked about his side of the situation.
98. Vickers amended his EEOC charge to add further allegations of retaliation.
99. Vickers was terminated without being given a reason.

100. When Vickers turned in company property, he met with Jay Jansen.

101. Vickers asked Jansen why he was fired.

102. Jansen told Vickers that he would have to take that up with Sandy, Nick, and Doug. Sandy is Sandy Cochrane, the CEO. Nick is Nick Flanagin, the COO. Doug, is Doug Barber, the Chief People Officer.

103. Defendants actions have demonstrated a carefully planned out pattern of discrimination and retaliation, sustained for years, at the highest levels of the company, and an intent to evade the law by offering false reasons for their actions.

## COUNT I – RETALIATION – 42 U.S.C. 1981

104. Plaintiff re-alleges the foregoing as if fully set out herein.

105. Each Defendant has retaliated against Plaintiff on the basis his opposition to and investigation of discrimination based on color and race in hiring and firing in violation of 42 U.S.C. 1981.

106. As a direct and proximate cause of each Defendant's acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

107. All Defendants' actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

WHEREFORE, Plaintiff prays for back pay and benefits, appropriate compensatory damages, punitive damages, for reinstatement or front pay, for an injunction requiring Defendant to remove all adverse information from Plaintiff's file, for Declaratory Judgment that Defendant has violated federal law and has requested above, for appointment of an independent monitor, for an order directing them to offer Vickers COO classes, for a requirement that all claims of discrimination and retaliation are kept in an electronic database for

seven years (to include, name, address, phone, e-mail, store worked for, job title of the complaining party, nature of the complaint, the result, and names and contact information for all investigators, witnesses, and decision-makers in that situation), for anti-discrimination training, for a company wide hot line administered by an independent contractor for a reasonable attorney's fee, for costs, for a trial by jury, and for all other proper relief. Plaintiff reserves the right to amend once a right to sue letter has been issued to add claims under the ADA, ADEA, and Title VII.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
P. O. Box 2012
Benton, Arkansas 72015
(501) 315-1910 FAX 501-315-1916
Attorneys for the Plaintiff

By: /s/ James M. Scurlock
James M. Scurlock, TN BPR NO. 032912
james.scurlock@gmail.com