IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MIKE VICKERS                                                              PLAINTIFF

VS.                          NO. 3:13-CV-01162

CRACKER BARREL OLD COUNTRY STORE, INC.,
NICK FLANAGAN, SANDY COCHRAN, DOUG
BARBER, CHARLIE AUSTIN, and JAY JANSSEN        DEFENDANTS

SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, by and through counsel, Sutter & Gillham, PLLC, who for his Second Amended Complaint, states:

PARTIES AND JURISDICTION

1. Mike Vickers was employed by Defendant Cracker Barrel Old County Stores, Inc., (CBOCS) for nearly 20 years. His last position was that of a District Manager, which he held for 16 years. Vickers is a resident and citizen of the State of Arkansas.

2. CBOCS is a Tennessee, for-profit corporation, operating in an industry that substantially impacts interstate commerce, and is headquartered in Nashville, Tennessee. The individual defendants are persons, officers and managers of CBOCS who took part in the decisions and actions causing injury, which were direct out of the corporate office in Nashville, Tennessee. Many of them are residents and citizens of Tennessee, residing in the Middle District of Tennessee. This is an action brought for violations of 42 U.S.C. 1981, for an amount exceeding that required for diversity jurisdiction. Plaintiff filed charges of discrimination within 180 days of the

discriminatory acts, has received his right to sue letter, and has moved to amend less than 90 days after receipt of that letter.

## GENERAL ALLEGATIONS OF FACT

3. In each year from 2010 through 2013, Defendant Cracker Barrel employed more than 500 persons during more than 20 weeks of the calendar year.

4. At all times, Vickers was a satisfactory employee.

5. In the past, Cracker Barrel has had to reach a settlement with US DOJ regarding racially discriminatory practices.

6. As a result, management, including Vickers, had training on issues of discrimination while with Cracker Barrel.

7. In 2010, Mike Vickers' boss was Al Dozier (Regional Vice President).

8. Nicholas Flanagan was Vice President of Restaurant Operations at CBRL Group, Inc., from July 2008 to November 3, 2010. After that he came Senior VP of Operations at Cracker Barrel Old Country Store, Inc., and his responsibilities included all Cracker Barrel locations, supervising the 10 Regional Vice Presidents, and the Restaurant Operations Administration Team.

9. In 2009 and 2010, management was receiving direction to hire younger managers.

10. For instance in December 2009, Plaintiff sat down at Table 215, at 8:30 p.m., with Nick Flanagan, who started telling him that they needed to get younger District Managers, and that their Field Managers were too old.

11. Plaintiff said a manager named Scott was doing a good job. Flanagan asked how old he was. Plaintiff said he was in his early thirties. Flanagan then said they needed younger people.

12. For instance, in February 2010, Dozier called Vickers and told him we're looking for younger people.

13. In March 2010, Dozier told Vickers we're going to get Arkansas younger.

14. Dozier stated the Flanagan was putting pressure on him to hire younger managers.

15. Vickers also was told by a recruiter for his region, Patty Kearns, that they were being told to recruit younger people and it was going to get Cracker Barrel in trouble.

16. Rob Harig was Director of HR.

17. Rob Harig told the recruiters to recruit younger people according to Kearns.

18. In February 2010, at the Little Rock Airport, Vickers went to Cary Jones, who was in loss prevention and told him that they were trying to make Vickers hire younger people and that it was driving him crazy because it was wrong and against the law. Vickers stated that they had already gotten in trouble for this sort of thing. Vickers told Jones what Kearns had said.

19. The next day, Vickers was in a meeting in Texas, with 7 to 8 other District Managers, Jones, Dozier, Bob Doyle (Vice President of Quality Assurance), and Joe Hardman (Director of Loss Prevention and Jones' boss).

20. Dozier and Hardman were next to each other, and Vickers was seated directly across from Hardman.

21. Dozier made the comment that there were too many men in the room (all were male), and that they needed to get some women.

22. Hardman shook his head and stared at Vickers.

23. Days later, in March of 2010 Vickers was in Myrtle Beach, South Carolina, at a roll out of the "seat to eat" concept, which he had been instrumental in developing.

24. Anita Tabb, who was Project Manager for S2E, was there as well.

25. Anita told Vickers, that her boss, Mike Chissler, who was Director of Innovations, had told her to make detailed notes about Vickers and his activities and send them to Chissler on a weekly basis. Anita told Vickers it was wrong and they were coming after him.

26. Before this meeting, Vickers had the numerous honors and accomplishments.

27. After that meeting, Vickers was not awarded any more such honors and was no longer invited to COO classes.

28. COO classes are important for getting promotions.

29. Before that meeting, Vickers got calls from other members of management.

30. After that meeting, Vickers no longer got such calls.

31. Yet Vickers continued to run his stores in an effective, quality manner, and maintained good numbers.

32. In 2010, Vickers was warned after that meeting that they would wait for more than a year, and then start to take steps against him in retaliation.

33. Later in 2010, Kearns, who Vickers had specifically mentioned to Jones at the Airport, was fired, even though she had good evaluations.

34. Christy Dunblazer replaced Kearns and later told Vickers that the practice of recruiting younger workers as opposed to older workers was continuing.

35. In 2010, Cracker Barrel contracted with a company called Steritec to come and do inspections of their stores to help maintain their health and sanitary practices at an appropriate level.

36. The relationship was supposed to be a partnership, and they were supposed to keep the same inspectors.

37. Yet Vickers inspectors were regularly changed.

38. In 2011, Charlie Austin became Vickers' boss and RVP.

39. As soon as he came in, Austin started repeatedly directing Vickers to hire younger managers.

40. Indeed, Austin sent Vickers three managers who were in their twenties, who were very poor managers.

41. Meanwhile, Austin was trying to get Vickers to get rid of other, good managers.

42. Vickers did not follow the instructions to hire based on age as considering age in employment decisions is forbidden under the ADEA.

43. In May 2012, Austin wrote Vickers up for a score of 64 on the Steritec inspection at the 468 store in North Little Rock.

44. However, that score was incorrect and was later corrected to a 73, which was passing.

45. Other managers have had far more failed inspections without consequence.

46. For instance, DM Ray Johnson was promoted to Regional Vice President, despite 5 failed inspections in a row.

47. DM Bill Ballard failed actual health department inspections, which is more serious as it can cost money, cause further inspections, and become public knowledge, negatively impacting the brand. Vickers asked Ballard if he had been written up for this, and Ballard told him that Austin did not write him up, but just told him to do better.

48. John Beasley was a DM, who got transferred to a District with higher volume, and therefore more pay, even though he had gotten an inspection score of 59. Beasley was not written up.

49. DM Mike Prentiss was put into COO classes even though he got an inspection score of 62.

50. Austin managed in a way that was both discriminatory and retaliatory.

51. Austin fired one of Vickers best managers, who had been GM of the year four years ina row, for fraternization. The manager was in his forties. However, a manager in his twenties committed fraternization and was not fired.

52. Vickers had continued to get good evaluations because his numbers were good.

53. Vickers told Austin that the score was wrong, and that other people had failed more inspections, but Austin told him it did not matter, and that he was writing Vickers up anyway.

54. In late 2012, one of Vicker's GMs, Roy Espe, in Northwest Arkansas stated at a GM meeting that the way to keep staff in the dish-room was to hire Hispanics, preferably females.

55. Vickers immediately told Espe he could not do that.

56. Then, in February 2013, Vickers got a complaint of discrimination from Associate Manager, Mike Wiggins, aged approximately in his mid-fifties, that Espe was treating him in a discriminatory fashion.

57. The other associate managers at Espe's store were younger than Wiggins.

58. Accordingly, Vickers went and met with Wiggins as soon as he could

59. Wiggins told Vickers that he would be written up if he was not on the floor when Espe came in, but that nothing was done to the other managers, Ronnie Jones, Ben Campbell, and Rick Schadel. Wiggins indicated that Espe treated him in abusive manner, calling him up and cursing at him over a to go meal, even though there had been nothing wrong with it.

60. Wiggins told Vickers that Espe had engaged in discrimination based on race, color, gender, and ethnicity in that he would not let them hire anything but hispanic females in the dishroom.

61. Jones, as well as Elana Griffin, told Vickers that Jones had hired two white males in the dishroom and that Espe ran them off.

62. Notably, Griffin, who was very well qualified, was interviewing for a retail DM position, at the time. After writing the statement confirming discrimination, she did not receive the position.

63. All managers, except for Rick, confirmed Espe's behavior and gave statements.

64. Vickers called Jackie Wythie (ER Specialist) and asked that she get him the demographics of the kitchen and dishroom. This confirmed the pattern of discrimination in hiring based on color, race, ethnicity, and gender.

65. Vickers interviewed Espe who admitted to multiple discriminatory practices of discriminating based on color, race, gender, and ethnicity, by favoring Hispanic females for hiring in the dishroom, and refusing to hire Hispanic persons as wait staff.

66. Espe accused Ronnie Jones of doing this to get his job.

67. Although Espe was generally a competent manager, he had admitted to a pattern of illegal, discriminatory employment practices, and had recently been instructed not to do that. Espe was aware of the policies against discrimination.

68. Thus, Vickers recommended that Espe be fired to Austin and the home office.

69. Vickers' investigation and recommendation took two days.

70. Thus, Vicker's participated in an investigation of discriminatory practices that were illegal under Title VII, the ADEA, and 42 U.S.C. 1981, and by doing so opposed that conduct and engaged in an effort to vindicate the rights of minorities.

71. From there, Austin and the home office took four months to do any further investigation and make a decision. They decided to put a piece of paper in Espe's file, but nothing else.

72. In March of 2013, there was a meeting of District Managers, and other staff, from across the nation, at which Nick Flanagan appeared and spoke.

73. Flanagan stated at this meeting that the average age in the industry is 26. He then stated, we are 43. The tone, expression, and body language indicated this was not a good thing.

74. In mid-March of 2013, Austin came and gave Vickers an evaluation. This was about one month after Vicker's investigation of Espe.

75. Overall, the evaluation was good.

76. There were some portions of the evaluation where Vickers was given a needs improvement.

77. These ratings were subjective, not objective, as they were not based on any particular statistics.

78. As far as Vicker's statistics went, his numbers were good, and were far from the worst of the District Managers under Austin, or in the company.

79. At this time, Vickers was also put on a performance improvement plan by Austin.

80. The PIP accused Vickers of things that were not true, that were controverted by his evaluation. Vickers told Austin this.

81. Vickers was told by Austin that if he failed to meet the goals of the PIP in any area at all, he would be fired. Vickers was told that if he failed any Steritec or Health Department inspection he would be fired.

82. The PIP stated that Vickers complaints were over 1.0 and had to get lower. In fact, Vickers' complaints were at .9, and he told Austin this.

83. The PIP indicated that Vickers' management turnover was too high, and that he had been surprised by resignations. In fact, there was another DM with higher turnover. In addition, there was only one manager resignation that had come as a surprise.

84. Furthermore, there were District Managers who had worse numbers, including complaints, who had not been disciplined or put on a PIP.

85. Accordingly, Vickers indicated that he was being treated illegally.

86. Vickers filed an EEOC charge, alleging discrimination and retaliation.

87. Vickers made a complaint to the home office of retaliation and discrimination to Tonja Jones, employee relations managers. She said they would look into it.

88. Tonja Jones got back with Vickers and told him that they were fine with what Austin was doing, and that he should just work through the PIP.

89. Austin told Vickers that if he came back in a couple of weeks and fired him, that Vickers would thank him.

90. In May 2013, Mike Mott came and met with Vickers at Panera Bread. Jay Janssen, the Regional HR Manager was also present. Mott is the VP of Human Resources and reports to Doug Barber, who is Chief People Officer, and reports to Sandy Cochran, who is CEO and President of the Board.

91. Mott told Vickers that he understood that Vickers and Charlie Austin were not getting along, which was a reference to and he was there to see what they could do going forward.

92. However, Mott never attempted to discuss, a transfer, Vickers' side of it, the allegations of discrimination and retaliation, how Vickers was doing on the PIP, hat might be done to alleviate the problems between Vickers and Austin, or Vickers performance.

93. Instead, Mott offered Vickers a severance package, even though Vickers had not yet completed the PIP, and his numbers had been improving.

94. During this meeting, Mott told Vickers that even if he did not accept the severance package, this is where it would end eventually.

95. Shortly after that meeting, Vickers was suspended. Paul Seals, a VP of Human Resources, told Vickers he was being suspended, and said that it was Austin's decision.

96. Vickers was told that it was based on an investigation going on into an accounts receivable issue in North Little Rock.

97. Despite the fact that an investigation was going on, Vickers was never asked about his side of the situation.

98. Vickers amended his EEOC charge to add further allegations of retaliation.

99. Vickers was terminated without being given a reason.

100. When Vickers turned in company property, he met with Jay Janssen.

101. Vickers asked Janssen why he was fired.

102. Janssen told Vickers that he would have to take that up with Sandy, Nick, and Doug. Sandy is Sandy Cochran, the CEO. Nick is Nick Flanagan, the COO. Doug, is Doug Barber, the Chief People Officer.

103. In the past, Cracker Barrel has had highly publicized allegations of discrimination made against it, both by employees, and by customers.

104. As a result, all allegations of discrimination are reported to company headquarters.

105. As a result, Cracker Barrel's upper management, Nick Flanagan and Doug Barber, are made aware of such allegations.

106. Cracker Barrel has policies, practices, or procedures regarding internal allegations of discrimination, termination, supervision of managers, discipline, performance improvement plans, and EEOC charges.

107. For instance, a manager, like Charlie Austin, cannot simply fire, discipline, or implement a PIP as to one of his direct subordinates (District Managers like Vickers), without involving his own supervisor, Nick Flanagan, in the decision, and getting Flanagan's approval.

108. Austin has weekly meetings with Flanagan in which manpower issues are discussed, including issues of performance, discipline, PIPs, and allegations of discrimination, or retaliation, are discussed, including the performance of District Managers like Vickers.

109. Austin in turn has these sorts of meetings with his subordinates.

110. Due to these meetings and practices, Nick Flanagan knew of Vickers' opposition to discriminatory activities, and of his EEOC charges, both as to the allegations of age and race discrimination.

111. Due to these meetings, Nick Flanagan knew that the basis for the PIP that was given to Vickers was false.

112. Due to these meetings, Nick Flanagan knew that there were other District Managers with worse performance, and also knew that they had not complained of or opposed discrimination, including racial discrimination.

113. Despite knowing that the allegations against Vickers were false, and that other worse performing DM's who had not engaged in a protected activity, had not been put on a PIP, Flanagan took part in the decision to give Vickers a PIP, doing so because of Vickers' protected activities.

114. In addition, pursuant to the policies and procedures mentioned above, Flanagan also had to be involved in the suspension and termination decision of Vickers.

115. Flanagan's and Austin's decisions to suspend and discharge Vickers are a pretext to cover retaliation for the following reasons: (a) they closely followed the filing of EEOC charges; (b) they were purportedly based on performance Flanagan and Austin knew to be false; (c) Flanagan and Austin knew that Vickers had not been allowed to even complete his PIP; (d) Flanagan and Austin knew that Vicker's numbers in the areas he had been criticized were actually improving; (e) Flanagan and Austin knew that as to the investigation into the accounts receivable issue that Vickers had not been asked for his side of the story.

116. Cracker Barrel policy and procedure required that Human Resources had to participate in terminations and handling EEOC charges. Indeed, management such as Vickers and Austin were informed of EEOC charges through the HR elements of the company. If a charge of discrimination was filed in Austin's region, the Regional HR Manager, Janske, knew about it. If someone who had filed a charge of discrimination was to be disciplined, HR had to be consulted.

117. Cracker Barrell procedure was such that if a District Manager was to be disciplined or filed a charge of discrimination, the level of HR involvement had to higher than that, and would include Mike Mott and Doug Barber.

118. Doug Barber as Chief People Officer supervised the HR and employee relation functions of the company.

119. By virtue of their involvement, Mott and Barber would have known that the allegations against Vickers of poor performance were false, that there were DMs who had not complained of discrimination with worse performance who were not being disciplined, that Vickers' numbers were improving, that he had not been allowed to complete his PIP, that he had not been asked his side of matters as to the accounts receivable issue. Accordingly, by suspending and firing Vickers, they knew about, approved of, and participated in retaliation against him for his protected activities.

120. An allegation of a pattern of discrimination by a general manager of a store, such as Espe, that has been confirmed by witnesses and the DM, is a very serious issue, especially because that manager had received training not to do such issues,

and had been specifically instructed by his DM not to do that, which also makes the misconduct a insubordination, as well as a willful violation of the law.

121. Given the seriousness of such an allegation against Espe, Cracker Barrel procedure would have required that Doug Barber be informed of it.

122. Firing a District Manager is a step not lightly taken as it impacts more than one store, and involves ending a relationship with what is usually a long term employee, in whom Cracker Barrel has invested considerable training and effort.

123. As such, Cracker Barrel procedure is that the level of HR involvement involves Doug Barber, the Chief People Officer, who reports to Cochran directly.

124. Furthermore, given the seriousness of the allegations in Vicker's EEOC charge, and the level of the company that they arose at, Sandy Cochran was informed of Vicker's EEOC charge, the allegations of race discrimination that preceded it, the PIP, the evaluation, the suspension, and the termination.

125. Moreover, the suspension and termination were approved by Austin, Flanagan, Cochran, Mott, Janssen, and Barber.

126. Defendants actions have demonstrated a carefully planned out pattern of discrimination and retaliation, sustained for years, at the highest levels of the company, and an intent to evade the law by offering false reasons for their actions.

## COUNT I – RETALIATION – 42 U.S.C. 1981

127. Plaintiff re-alleges the foregoing as if fully set out herein.

128. Each Defendant has retaliated against Plaintiff on the basis his opposition to and investigation of discrimination based on color and race in hiring and firing in violation of 42 U.S.C. 1981.

129. As a direct and proximate cause of each Defendant's acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

130. All Defendants' actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

## COUNT II –ADEA

131. Plaintiff re-alleges the foregoing as if fully set out herein.

132. Defendant CBOCS has retaliated against Plaintiff on the basis his opposition to and investigation of discrimination based on age, and discriminated against him based on his age.

133. As a direct and proximate cause of Defendant CBOCS acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

134. Defendant CBOCS actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

## COUNT III –TITLE VII

135. Plaintiff re-alleges the foregoing as if fully set out herein.

136. Defendant CBOCS has retaliated against Plaintiff on the basis his opposition to and investigation of discrimination based on race, color, ethnicity, and gender.

137. As a direct and proximate cause of Defendant CBOCS acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

138. Defendant CBOCS actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

## COUNT IV – ADA

139. Plaintiff re-alleges the foregoing as if fully set out herein.

140. Defendant CBOCS has retaliated against Plaintiff on the basis his opposition to discrimination based disability.

141. As a direct and proximate cause of Defendant CBOCs acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

142. Defendant CBOCs actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

## COUNT V – ARKANSAS CIVIL RIGHTS ACT

143. Plaintiff re-alleges the foregoing as if fully set out herein.

144. Each Defendant has retaliated against Plaintiff in violation of the Arkansas Civil Rights Act, on the basis his opposition to discrimination based disability, and investigation of and opposition to discrimination based on race, color, ethnicity, and gender.

145. As a direct and proximate cause of each Defendant's acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, lost fringe benefits, has been stigmatized in the community, loss of earning capacity, and incurred other damages in an amount to be proven at trial.

146. All Defendants' actions have been in intentional, willful, and malicious violation of the law, so as to warrant imposition of punitive damages.

WHEREFORE, Plaintiff prays for back pay and benefits, appropriate compensatory damages, punitive damages, for reinstatement or front pay, for an injunction requiring Defendant to remove all adverse information from Plaintiff's file, for Declaratory Judgment that Defendant has violated federal law and has requested above, for appointment of an independent monitor, for an order directing them to offer Vickers COO classes, for a requirement that all claims of discrimination and retaliation are kept in an electronic database for seven years (to include, name, address, phone, e-mail, store worked for, job title of the complaining party, nature of the complaint, the result, and names and contact information for all investigators, witnesses, and decision-makers in that situation), for anti-discrimination training, for a company wide hot line administered by an independent contractor for a reasonable attorney's fee, for costs, for a trial by jury, and for all other proper relief.

        Respectfully submitted,

        Andrew C. Clarke
        Law Office of Andrew C. Clarke
        6250 Poplar Avenue
        Second Floor
        Memphis, TN 38119
        *Email: aclarke@accfirm.com*

BY:    */s/ Andrew C. Clarke*
        Andrew C. Clarke

        SUTTER & GILLHAM, P.L.L.C.
        Attorneys at Law
        P.O. Box 2012
        Benton, AR 72018
        501-315-1910  Office
        501-315-1916  Facsimile
        Attorney for the Plaintiff

By:    */s/ Lucien Gillham*
        Lucien Gillham, AR Bar No. 99199
        *lucien.gillham@gmail.com*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel for the Defendant:

>Maralee M. Downey
>WALLER LANSDEN DORTCH & DAVIS LLP
>Nashville City Center
>511 Union Street, Suite 2700
>Nashville, TN 37219
>(615) 244-6380
>(615) 244-6804 (fax)
>*Marcus.Crider@wallerlaw.com*
>*Maralee.Downey@wallerlaw.com*
>
>Donna L. Roberts (#22249)
>Cracker Barrel Old Country Store, Inc.
>P.O. Box 787
>Lebanon, Tennessee 37088
>(615) 235-4262
>*Donna.roberts@crackerbarrel.com*

>>*s/ Andrew C. Clarke*
>>Andrew C. Clarke